UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

BRUCE L. BIEKER,                          )
                                          )
        Plaintiff,                        )
                                          )
   v.                                     )        CIVIL NO.  2:07cv23
                                          )
MICHAEL J. ASTRUE,                        )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
        Defendant.                        )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social Security Act.  42 U.S.C. §416(I); 42 U.S.C. §423; 42 U.S.C. §§ 1382, 1382c(a)(3).  Section 205(g) of the Act provides, <u>inter alia</u>, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law

Judge ("ALJ") made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The medical evidence establishes that the claimant has obsessive compulsive disorder, personality disorder, and affective disorders. These medically determinable impairments cause significant limitations in the claimant's work related functioning and are, therefore, severe within the meaning of the Regulations.

4. There are no objective medical findings that precisely meet the criteria of any listed impairment in Appendix 1, Subpart P, Regulations [sic] No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The evidence of record as a whole supports a finding that the claimant has no exertional limitations, but is restricted to the performance of simple, routine work.

7. The claimant is unable to perform his past relevant work as an electrician. (20 C.F.R. §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 45 and 49" (20 C.F.R. §§ 404.1563 and 416.963).

9. The claimant has "more than a high school education." (20 C.F.R. §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from skilled work previously performed as described in the body of the decision to other work in the national economy (20 C.F.R. §§ 404.1568 and 416.968).

11. Considering the types of work that the claimant is still functionally capable of performing in combination with the claimant's age, education and work experience, he could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. Examples of such jobs include work as a janitor, with 10,000

jobs existing regionally.

12.     The claimant was not under a "disability," as defined in the Social Security Act at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 18-19)

Based upon these findings, the ALJ determined that Bieker was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Bieker filed his opening brief on June 27, 2007.  On August 6, 2007, the defendant filed a memorandum in support of the Commissioner's decision, and on August 16, 2007,  Bieker filed his reply.  Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be reversed.

A five step test has been established to determine whether a claimant is disabled.  See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).  From the

nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative

inquiry.

Bieker filed his DIB and SSI applications on July 6, 2004, alleging disability as of April

29, 2004, due to chronic depression, bipolar disorder, obsessive compulsive disorder, and

schizoid personality traits.   Bieker was 48 years old at the time of the ALJ's decision (Tr. 83).

He has more than a high school education (Tr. 66) and had past relevant work as an electrician.

(Tr. 19).

At the hearing in November 2005, Bieker testified that he last worked as an electrician

in March 2004, when he was laid off (Tr. 242-43). He stated that the Union had not sent him out

on another job since that time because there was no work available in the area (Tr. 243). He

noted that there was a lack of work starting around 2001 due to bankruptcies in the steel industry

(Tr. 244). When the ALJ asked Bieker whether he could do a different job, Bieker indicated that

he had difficulty eating and with his memory (Tr. 244). He had previously done some lighting

equipment for bands, but had not done this since the previous summer (Tr. 245). Bieker testified

that he did not believe he could work at the time due to a lack of energy, together with his weight

loss (Tr. 247-48). He had hypothyroidism and a lot of anxiety. He had not had a regular sleep

pattern in a year and one-half (Tr. 249). Bieker testified he had a lot of trouble making a

decision, including a decision as to what to eat, and he had trouble completing tasks (Tr. 250-

51).

Bieker testified that he often felt like he was about to "tip over" and had difficulty

judging spaces (Tr. 252-53). He took a nap during the day two or three days a week (Tr. 253).

He did not have close friends and tried to avoid stress, for example, by going to the store when it

was not crowded (Tr. 254). He saw his girlfriend about two or three times a week and sometimes on the weekend.

Bieker's girlfriend testified that she spent 4-5 hours with Bieker a couple of days a week (Tr. 254). She had noticed that Bieker had trouble communicating sometimes and also difficulty concentrating (Tr. 254-55). Sometimes he was very irritable (Tr. 255). He did not eat a lot (Tr. 256).

On July 1, 2004, Bieker was evaluated at the Porter County Family Counseling Center (PCFCC) by Stanley Lelek, Psy.D., on referral from Dr. Ames, Bieker's family doctor (Tr. 109-10). Bieker complained of depression related to his divorced status, unemployment, and the realization that he might have Asperger's Syndrome (a development disorder on the autism spectrum) (Tr. 109). He complained that he became very tired and could not concentrate. During the evaluation, he seldom made eye-contact and perseverated in his discussion. He had been hospitalized for psychiatric reasons for one week through Porter-Starke Services after his wife asked for a divorce some years previously (Tr. 109). He had apparently been prescribed antidepressants by a prior family doctor.

On the mental status examination, Bieker's thoughts were coherent, relevant, and orderly (Tr. 110). He was fully oriented, had no suicidal ideation, and no hallucinations or delusions. His intelligence was within normal limits. Bieker reported that he did not eat on a regular basis, but did sleep well. His overall mood was subdued, and he did not make eye contact.

The initial diagnostic impression was possible major depressive disorder, recurrent, moderate with a current Global Assessment of Functioning (GAF) score of 50, indicating serious

symptoms or limitations (Tr. 110). The psychologist indicated that Bieker should stay on the medications prescribed by Dr. Ames for his depression. Bieker was told that he was welcome at the PCFCC, but they were unable to diagnose or treat Asperger's Syndrome. It was recommended that he see a psychiatrist, but could use their counseling services grounded in

cognitive behavior therapy, interpersonal therapy, and problems solving therapy. It was also recommended that Bieker apply for Social Security disability benefits.

On July 27, 2004, Dr. Lelek completed a Report of Psychiatric Status after further evaluation (Tr. 115-21). At this time, Dr. Lelek assessed Bieker's GAF at 60, indicating moderate symptoms or limitations (Tr. 115). Bieker stated that he worked until 2000-2001, but did not go back to work due to the lack of work. He was neat, clean, and casually dressed, cooperative, but perseverated about his idea that he had Asperger's syndrome, displayed a flat mood, and spoke in a monotone (Tr. 116). His thought processes were loose and tangential.

Bieker was fully oriented, had a good long-term memory, but showed some difficulty with his short term memory (Tr. 117). He could do simple calculations and completed serial sevens with two errors (Tr. 118). He had a good fund of information and good judgment (Tr.118). Bieker had poor social contacts and poor social skills (Tr. 119). When stressed, he became tangential and perseverated on details.

In August 2004, a state agency psychologist reviewed the record and concluded that Bieker was mildly limited in the activities of daily living, and moderately limited in social functioning and concentration, persistence, or pace (Tr. 132). He concluded that he was moderately limited in the ability to maintain attention and concentration for extended periods, to work in coordination, or proximity to others, and to respond appropriately to changes in the work

setting (Tr. 136-37). He concluded that Bieker's functioning was greater than he described (Tr. 138) and that he could do simple routine tasks (Tr. 139). This assessment was later affirmed by another reviewing psychologist (Tr. 139).

Bieker went to Porter-Starke Services on August 26, 2004, where Linda Munson, D.O., a psychiatrist, conducted a psychiatric evaluation (Tr. 157-59). Bieker reported a life-long history of feeling isolated from others (Tr. 157). He described a past mood disorder of chronic depression alternating with occasional episodes of days without sleep and increased energy. He had many routines and rituals he had to perform each day. He stated he had only worked 12 weeks a year for the past 3 years.

On the mental status examination, Bieker avoided eye contact consistently, spoke in a droning monotone, showed little change in facial expression, and had a blunted and dysphoric affect (Tr. 158). He was cooperative and had difficulty describing his symptoms sequentially. He was goal directed and not tangential, but became bogged down with unnecessary details. He denied psychotic symptoms, but complained of chronic depression, a low mood and low energy and disturbed sleep. His intellectual abilities appeared average. His insight and judgment were influenced by obsessional thinking and difficulty generalizing.

Dr. Munson's impression was obsessive-compulsive traits, bipolar II disorder, attention deficit disorder, and Asperger's syndrome (Tr. 158-59). His current GAF was 50 (Tr. 159). Dr. Munson prescribed Lamictal for bipolar depression, recommended counseling, and wanted him to undergo an evaluation for ADHD.

On September 1, 2004, Sara Hardy, LMHC, to whom Dr. Munson had referred Bieker for individual therapy, conducted a one hour clinical session with him (Tr. 150-56). Bieker stated

that he was looking for a proper diagnosis of his Asperger's Syndrome or autism and presented internet documents to describe why he thought he had this disorder (Tr. 150). On the mental status examination, he was fully oriented, had a tired affect, avoided eye contact but was somewhat better towards the end of the session, displayed lethargic psychomotor activity, spoke slowly, and had a flat affect (Tr. 151). His thought processes were goal-directed and logical.

Bieker reported using marijuana daily for a period of 30 years (Tr. 153). He had been abstinent for about 42 days. The diagnostic impression was Dysthymic Disorder, rule out Bipolar Disorder, Rule out Asperger's Disorder, and Cannabis Dependence in early remission (Tr. 154). His current GAF was 55, indicating moderate symptoms or limitations; and his highest GAF in the last year was 65, indicating some mild symptoms or limitations "but generally functioning pretty well." DSM-IV-TR at 34.

On September 23, 2004, Bieker saw Dr. Munson and reported he had stopped the Lamictal after seven days, as it made him more depressed (Tr. 149). Dr. Munson prescribed Trileptal as a mood stabilizer (Tr. 149).

In October 2004, Bieker underwent another psychological evaluation by Thomas M.Allen, Psy.D., on the recommendation of Dr. Munson and Ms. Hardy (Tr. 215-22). Bieker again reported a 12-13 year history of significant anxiety and depression and indicated he thought that he had the symptoms of Asperger's Syndrome (Tr. 215). The mental status examination indicated that Bieker maintained poor eye contact; psychomotor agitation with the shaking of his legs, the wringing of his hands, and difficulty sitting still; a flat affect; and a guarded mood (Tr. 216). Bieker was tall and thin with a rigid posture, and his dress and grooming were disheveled. His speech was soft, and he sometimes mumbled. He denied suicidal

or homicidal ideation, hallucinations, or delusions. He reported difficulty with concentration and attention, procrastination, but at other times becoming so involved with something that he forgot to eat. He stated that he sometimes had difficulty with comprehension, although his intellectual ability appeared high average. His insight was fair, and he was fully oriented.

Bieker was taking Trileptal and Ativan (Tr. 216). He said the Trileptal was working fairly well without side effects, and he rarely took the Ativan three times a day. Bieker stated that he spent most of his time engaging in building lighting and sound things (Tr. 217).

Dr. Allen administered the Million Clinical Multiaxial Inventory (MCMI-III), reviewed the MMPI raw data from Dr. Lelek, and also administered the Rorschach Inkblot Test and the Asperger's Syndrome Diagnostic Scale, and consulted the Autism Research Institute Form E-II (Tr. 218-21). He concluded that it was unlikely that Bieker had an autism-like disorder (Tr. 221). Dr. Allen concluded that Bieker's diagnoses were Bipolar II disorder, most recent episode, depressed, and a Schizoid Personality disorder (Tr. 222). His present GAF was 52, indicating moderate symptoms or limitations; and his highest GAF in the past year was 70, indicating only some mild symptoms or limitations. Dr. Allen recommended that Bieker continue to receive psychiatric services through Dr. Munson and that, if he was to continue individual therapy with Ms. Hardy, that his treatment include a focus in his developing ways to experience pleasure and to increase social participation and relatedness.

On November 18, 2004, Bieker saw Ms. Hardy, his therapist, after calling for an emergency appointment due to anxiety (Tr. 189). The anxiety had mostly resolved (Tr. 189). When he saw Ms. Hardy on December 16, 2004, he was accompanied by his girlfriend, and he had a flat affect and depressed mood (Tr. 188). He was frustrated with the Medicaid application

process and the lack of report from his psychological evaluation.

In January 2005, Bieker and his girlfriend attended a meeting with Dr. Allen to get feedback on the results (Tr. 186). Bieker was quite anxious and critical of the Asperger's result. Shortly thereafter, he saw Dr. Munson and indicated he was depressed after the holidays, anxious about several matters, and disappointed with the test results (Tr. 185) His grooming and hygiene were casual but appropriate, he consistently avoided eye contact, and had a very flat affect and lack of modulation in his speech, although he was fluent and spontaneous verbally. He denied recent mood swings and thought the Trileptal was stabilizing him. His anxiety, however, was increasing.

In February 2005, Bieker saw Ms. Hardy and expressed some concern about language in the psychological report, but wanted to follow the recommendation that he work on social interaction (Tr. 184). In March 2005, he told Ms. Hardy that there was no significant change and he was having a lot of difficulty with debt (Tr. 183). He said he continued to have satisfying relationships with his girlfriend and his children. He had stopped looking for work, as he did not think that he could handle it. A week later, Dr. Munson reported that Bieker was adjusting better to the schizoid personality diagnosis, but remained clinically the same (Tr. 182).

On April 21, 2005, Dr. Munson, signed a "To Whom It May Concern" letter stating that Bieker was being treated at her facility for severe mental illness, and his symptoms were "significant and disabling" (Tr. 212). On the same date, Ms. Hardy noted that Bieker reported that he had received Medicaid (Tr. 181). He stated he was more depressed, but that he was having positive relationships with his parents, his son who lived with him, and his girlfriend. In May 2005, Ms. Hardy noted that Bieker and his girlfriend participated in a family session in

which Bieker reported increased depression (Tr. 180).

On May 19, 2005, Ms. Hardy noted that Bieker was frustrated by his interactions with various bureaucracies (Tr. 178). Bieker became tearful on learning that Ms. Hardy was leaving her job at Porter-Starke.

In June 2005, Bieker and his girlfriend saw Dr. Allen for therapy (Tr. 168-69). Bieker had a flat affect and a depressed, frustrated mood, but his appearance was neat and well kempt (Tr. 168). Bieker was frustrated with various problems involving his debt, the possibility of losing his house, and had obsessive-compulsive ruminations about his financial stressors. He could work on things for about three hours a day and then was exhausted. Dr. Allen noted that Bieker had developed rapport with Ms. Hardy (Tr. 169).

When Bieker saw Dr. Munson in July 2005, she lowered his Trileptal temporarily because Bieker's girlfriend said he seemed to have lost energy since starting it, although his anxiety had improved greatly (Tr. 166). Dr. Munson prescribed Trazodone for sleep.

In August 2005, Bieker saw Dr. Allen for therapy and expressed irritation regarding his continued anxiety, financial problems, loss of his Medicaid when he was able to access his retirement funds, the death of his bird, and the nature of both his medical and counseling therapy (Tr. 163). He still believed he was on the autism spectrum.

When Bieker returned to see Dr. Munson in August 2005, he reported that the decreased Trileptal had helped his fatigue and motivation but increased his anxiety (Tr. 162). His affect and presentation were unchanged, and Dr. Munson raised the Trileptal somewhat.

On September 15, 2005, Dr. Munson signed another "To Whom It May Concern" letter in

which she stated that Bieker had a long history of symptoms of mental illness, had been treated

by several providers and various medications (Tr. 211). He started treatment with her in August

2004 and underwent psychological testing. He did not tolerate psychotropic medications well

and it was a challenge to find medications he could take without side effects. His symptoms had

increased over the last few years and he was more socially isolated. His anxiety level was high,

which was made more difficult by his need to do things in an organized manner due to his OCD

traits. His depression, at times, caused suicidal ideation. She ended the letter by stating that she

"d[id] not anticipate that his symptoms will significantly improve in the future and [she] d[id]

not feel that he could function at work" (Tr. 211).

On the same date, Dr. Munson also placed check marks on a "Medical Sources Statement

of Ability To Do Work-Related Activities (Mental)" (Tr. 213). She indicated that Bieker had

moderate limitations in the ability to understand, remember, and carry out short, simple

instructions; marked difficulties in the ability to understand and remember and carry out detailed

instructions; and extreme difficulty in the ability to make judgments on simple work-related

decisions (Tr. 213). These limitations were due to the fact that he was easily confused and had

obsessive thinking. In addition, according to Dr. Munson, Bieker had marked difficulties in

interacting properly with the public, supervisors, and co-workers, responding appropriately to

work pressures and changes in a work setting due to his avoidant behaviors (Tr. 214).

The ALJ found that Bieker was insured for benefits through the date of the ALJ's

decision and had not engaged in substantial gainful activity since his alleged onset date of

disability (Tr. 18). He determined that Bieker's had the severe impairments of an obsessive

compulsive disorder, a personality disorder, and affective disorders, but that Bieker did not have

an impairment or combination of impairments that met or medically equaled any listed in the

Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A.  Th e ALJ found Bieker's

subjective allegations were not fully credible. Bieker had the residual functional capacity (RFC)

for any exertional work, but was limited to simple, routine work. Bieker could no longer perform

his past relevant work as an electrician (Tr. 19). Using the Medical-Vocational Guidelines

(grids) as a framework, together with the testimony of the VE, the ALJ found that Bieker could

perform a significant number of other jobs in the economy and was, therefore, not disabled.

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The agency

has promulgated regulations that set forth a five-step sequential process for analyzing disability

claims.  20 C.F.R. §§ 404.1520, 416.920.  A claimant has the joint burdens of production and

persuasion through at least step four, where the individual's residual functional capacity (RFC)

is determined.  Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); 20 C.F.R. §§ 404.1545,

416.945.  At step five the Commissioner bears the burden of proving that there are jobs in the

national economy that the Bieker can perform.  Herron v. Shalala, 19 F.3d 329, 333 n.18 (7th Cir.

1994).  In the present case, the ALJ found that the Bieker retained the ability to perform other

work within the national economy.

The agency's final decision is subject to review pursuant to 42 U.S.C. § 405(g), which

provides that the agency findings "as to any fact, if supported by substantial evidence, shall be

conclusive."  "Substantial evidence is . . . such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).

Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a

claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or on the

[Commissioner's] designate, the ALJ)." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir.

1987)(citations omitted).  This court must accept the ALJ's findings if they are supported by

substantial evidence, and may not substitute its judgment for that of the ALJ. Delgado v.

Bowen, 782 F.2d 79, 82 (7th Cir. 1986).

Bieker first argues that the ALJ's decision is contrary to law.  Bieker claims that the ALJ

violated SSR 96-2 in that he failed to give controlling weight to the opinion of Bieker's treating

psychiatrist. SSR 96-2p requires that the ALJ give the treating source's medical opinion

controlling weight if it is "well-supported and not inconsistent with other substantial evidence in

the case record." Furthermore, SSR 96-2p requires that the ALJ's "decision must contain specific

reasons for the weight given to the treating source's medical opinion, supported by the evidence

in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight." SSR 96-2p. Additionally, 20 C.F.R. § 404.1527(d)(2) establishes six criteria that must

be evaluated when determining the weight that should be given to a treating physician's opinion.

*See Butera v. Apfel*, 173 F.3d 1049 (7th Cir. 1999). The six criteria are:

> 1) the nature and extent of the treatment relationship;
>
> 2) the degree to which the medical signs and laboratory findings support the
>    opinion;
>
> 3) the degree to which the opinion takes into account all of the pertinent evidence
>    in the record;
>
> 4) the persuasiveness of the opinion rendered;

15

5) the consistency of the opinion with the record as a whole; and,

6) the specialization of the physician.

*Butera*, 173 F.3d at 1056.

In *Butera*, the court noted that the ALJ did consider each of these factors before determining that the claimant's treating physician's opinion should not be given controlling weight. *Id.* The court noted that the relationship was based on a one-time emergency room examination, that the laboratory findings did not support the physician's opinion, the physician did not obtain evidence beyond her own examination, the opinion was not persuasive in that the doctor based her opinion on the claimant's complaints which were deemed not credible, other specialists did not agree with the physician's conclusion, and the physician was not a specialist. *Id.* at 1056-57.

Likewise, in *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000), the claimant's treating physician reported that the claimant was "severely limited in her ability to perform any work requiring standing and walking" and "could not perform any repetitive work due to her hand osteoarthritis and paresthesias." *Id.* at 869. The ALJ did not treat this opinion as controlling because the ALJ did not believe that the opinion was supported by medical evidence or that it was consistent with the claimant's activities of daily living. *Id.* The court remanded the matter, concluding that the ALJ did not adequately explain why he rejected the opinion of the claimant's treating physician, and that the ALJ must not "select and discuss only that evidence that favors his ultimate conclusion." *Id.* at 871.

In *Smith v. Apfel*, 231 F.3d 433 (7th Cir. 2000), the Seventh Circuit remanded the case for further consideration when the ALJ discounted the treating physician's opinion. In *Smith*, the

16

ALJ merely stated that the treating physician's opinion was "not based on persuasive or even reasonable evidence." *Id.* at 437. Specifically, the ALJ criticized the treating physician's approach because an x-ray was not ordered. *Id.* The court stated that the duty to develop the record rests with the ALJ, and that if the ALJ believed that the medical evidence was insufficient, he should have ordered a more recent x-ray rather than discounted the opinion of the treating physician. *Id.* In reaching this determination the court concluded that the absence of objective clinical findings was not a sufficient basis for not giving the treating physician's opinion controlling weight. *Id.*

Bieker argues that, as in *Clifford* and *Smith*, the ALJ's decision did not give proper consideration to whether Bieker's treating psychiatrist's opinion should be given controlling weight. Bieker treated with Dr. Linda Munson for well over a year at the time of the ALJ's decision. (R. 211.) In September of 2005, Dr. Munson made the following findings regarding Bieker in her Medical Source Statement:

1.    Mr. Bieker has **extreme** limitations in his ability to make judgments on simple work-related decisions, *i.e.*, he has no useful ability to function in this area. (R. 213 (emphasis added).)

2.    Mr. Bieker has **marked** limitations in his ability to understand and remember detailed instructions, *i.e.*, he is severely limited in his ability to function in this area. (R. 213 (emphasis added).)

3.    Mr. Bieker has **marked** limitations in his ability to carry out detailed instructions, *i.e.*, he is severely limited in his ability to function in this area. (R. 213 (emphasis added).)

4.    Mr. Bieker has **marked** limitations in his ability to interact appropriately with the public, *i.e.*, he is severely limited in his ability to function in this area. (R. 214 (emphasis added).)

5.    Mr. Bieker has **marked** limitations in his ability to interact appropriately with supervisors, *i.e.*, he is severely limited in his ability to function in this area. (R. 214 (emphasis added).)

6.      Mr. Bieker has **marked** limitations in his ability to interact appropriately with co-workers, *i.e.*, he is severely limited in his ability to function in this area. (R. 214 (emphasis added).)

7.      Mr. Bieker has **marked** limitations in his ability to respond appropriately to work pressures in a usual work setting, *i.e.*, he is severely limited in his ability to function in this area. (R. 214 (emphasis added).)

8.      Mr. Bieker has **marked** limitations in his ability to respond appropriately to changes in a routine work setting, *i.e.*, he is severely limited in his ability to function in this area. (R. 214 (emphasis added).)

Dr. Munson further determined that  Bieker is easily confused, suffers from obsessive thinking, and exhibits avoidant behaviors. (R. 213-214.) In her narrative report, Dr. Munson also stated:

> Mr. Bieker, unfortunately, does not tolerate many psychotropic medications well and it has always been a challenge to find medications he can tolerate without side effects. His symptoms have intensified over the past few years and he is very isolated socially. He has difficulty even maintaining eye contact with others and speaks in a consistent monotone. … Depression, at times, becomes bad enough to cause suicidal ideation. I do not anticipate that his symptoms will significantly improve in the future and I do not feel that he could function at work.
> (R. 211.)

Dr. Munson's findings were corroborated in an earlier examination performed by Dr. Stanley Lelek, psychologist. (R. 109-110.) Dr. Lelek examined Bieker on July 1, 2004, and reported that Bieker did not make eye contact, perseverated when discussing relevant and nonrelevant information, and was given a GAF of 50. (R. 109- 110.) Despite counseling and medication,  Bieker was still given a GAF of 50 almost two months later. (R. 159.)

In October of 2004, Bieker was examined by Dr. John Spores, psychologist, and Dr. Thomas Allen, psychologist. (R. 215.) Their report dated January 3, 2005, noted that Bieker had poor eye contact, psychomotor agitation, and flat affect. (R. 216.)  Bieker also took the MMPI-II,

which indicated depressive features, obsessive compulsive thinking, and possible psychotic symptoms. (R. 219-220.) His prognosis was rated as guarded, and his GAF score at that time was 52. (R. 222.)

In his opinion, the ALJ referred to Bieker's treating psychiatrist, Dr. Linda Munson, as an "examining physician," and stated that he did not accord any significant weight to her opinion. (R. 17.) Specifically, the ALJ stated in one sentence that Dr. Munson's opinion was not well supported by the other "substantial" medical evidence of record. (R. 17.) Bieker argues that this is simply untrue and points out that a review of the record as a whole demonstrates overwhelming support for Dr. Munson's opinions. Even the non-examining consultants found that the claimant had some limitations. (R. 132, 136-137.)

Despite the wealth of consistent medical evidence, the ALJ gave greater weight to portions of the residual functional capacity determinations made by the non-examining consultative medical experts hired by the State Disability Determination Services, stating that their conclusions "support my conclusion as to the claimant's limitations and residual functional capacity…." (R. 16.)

Moreover, notwithstanding the significant limitations found by Dr. Lelek, Dr. Spores, and Dr. Allen, the fact that these limitations were consistent with the evidence and opinion of Dr. Munson, and Dr. Munson's role as Bieker's treating psychiatrist, Dr. Munson's opinion was not fully discussed or analyzed using the factors set forth in *Butera*. The ALJ did not fully analyze what weight should be given to Dr. Munson's opinions, or even state the weight given to Dr. Munson's opinions. Rather, in direct  violation of 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2), the ALJ elevated the opinions of non-examining consultative medical experts

19

above that of  Bieker's treating psychiatrist and objective findings on the psychological testing. Bieker claims that if the ALJ had given Dr. Munson's opinions the proper controlling weight, then a finding of disability would have been required.

Bieker further contends that a review of the ALJ's decision reveals that the ALJ rejected all of the medical source opinions given. Rather, the ALJ substituted his own findings by picking through portions of the non-examining expert psychologists' reports. Bieker claims that by failing to give the appropriate weight to the opinions of the treating and/or examining sources in this case, and by failing to explain what weight, if any, should be accorded to those opinions, the ALJ rendered a decision without any foundation in the evidence.

Vocational expert Grace Gianforte testified that no jobs would be available to Bieker in light of his extreme limitations as outlined by Dr. Munson. (R. 259-260.) However, the ALJ reached a decision contrary to the findings of Dr. Munson and failed to explain the weight given to Dr. Munson's opinion. This is a clear violation of the mandate set forth in SSR 96-2p.

The Commissioner maintains that the ALJ complied with SSR 96-2p, however the Commissioner's arguments and post hoc rationalization cannot overcome the fact that the ALJ limited his discussion of Dr; Munson's opinion to one paragraph and failed to evaluate or consider any of the six criteria found in 20 C.F.R. Section 404.1527(d)(2).  Rather, the ALJ designated Dr. Munson as merely an "examining physician" and made a single conclusory statement: "I have not accorded any significant weight to Dr. Munson's opinion as it is not well supported by the other substantial medical evidence of record, including the treatment notes and GAF scores set out above."  (Tr. 17). SSR 96-2p requires that the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p.  The Seventh Circuit has made clear that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some level his analysis of the evidence.'" *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  This court agrees with Bieker that the failure of the ALJ to comply with SSR 96-2p warrants reversal of the ALJ's opinion.

Bieker also argues that the ALJ erred in failing to give full effect to Bieker's depression in his determination of Bieker's residual functional capacity, in violation of SSR 96-8p  Under SSR 96-8p, the RFC assessment must be based on *all* relevant evidence in the case record, considering such factors as the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment, lay evidence, and reports of daily activities. SSR 96-8p (emphasis in original). Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone. SSR 96-8p.

In the present case, the ALJ determined that Bieker is restricted to the performance of simple, routine work. (R. 18.) The ALJ also found that Bieker has the following severe impairments: obsessive compulsive disorder, personality disorder, and affective disorders. (R. 18.) Bieker argues that the ALJ's finding that  Bieker's severe impairments limited him to simple, routine work is wholly inconsistent with the evidence presented. In this finding, the ALJ ignored the opinions of  Bieker's treating psychiatrist, as well as three other examining mental health professionals.

Dr. Munson found that Bieker has extreme limitations in his ability to make judgments on simple work-related decisions, *i.e.*, he has no useful ability to function in this area. (R. 213 (emphasis added).) And, Dr. Munson found that Bieker is easily confused, suffers from obsessive thinking, and exhibits avoidant behaviors. Bieker's depression is also severe enough to lead to suicidal ideations, disrupt his sleep, and cause him to forget to eat. (R. 213-214, 244, 247-250, 253, 255-256.)

Bieker contends that, through his selective acceptance of the evidence, the ALJ has attempted to minimize Bieker's severe impairments, and neglected to consider the extreme limitations resulting from Bieker's depression. Bieker further contends that the ALJ is "playing doctor" by substituting his own assessment of Bieker for that of the mental health professionals that examined him. ALJs are not free to substitute their own interpretation of medical evidence for a physician's interpretation without relying on other evidence in the record, and "must not succumb to the temptation to play doctor and make their own independent medical findings." *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Rohan v. Chater,* 98 F.3d 966 (7th Cir. 1996).

In addition, the Seventh Circuit has made clear that the "ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some level his analysis of the evidence.'" *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994.) Failure to consider an entire line of evidence falls below the minimal level of articulation required. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). Bieker claims that no reason was articulated by the ALJ for disregarding all evidence of the limitations presented by Bieker's severe impairment of depression and that such failure violates SSR 96-8p.

The Commissioner has failed to respond to Bieker's contention that the ALJ failed to

give effect to Bieker's depression in his determination of his residual functional capacity.  The

Commissioner has failed to point to the ALJ's reasoning for disregarding an entire line of

evidence.  In fact, no reasoning was articulated by the ALJ for disregarding this evidence, in

violation of SSR 96-8p.  Failure to consider an entire line of evidence falls below the minimum

level of articulation required in an ALJ's decision.  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir.

1995).

Bieker next argues that the ALJ also violated SSR 96-7p by finding that Bieker's

testimony was not entirely credible when he failed to specifically identify any basis for such a

finding in the decision. *See Martin v. Sullivan*, 750 F. Supp. 964, 970 (S.D. Ind. 1990) (citing

*Walker v. Bowen*, 834 F.2d 635 (7th Cir. 1987) and *Ablewski v. Schweiker*, 732 F.2d 75 (7th Cir.

1984)). Although a credibility determination can only be overturned if "patently wrong," Bieker

contends that the ALJ's errors in this case were so glaring that they meet that standard. *See*

*Caviness v. Apfel*, 4 F.Supp.2d 813 (S.D. Ind. 1998) (citing *Luna v. Shalala*, 22 F.3d 687, 690 (7th

Cir. 1994) and *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir, 1994)). In addition, this court has

greater freedom to review credibility determinations based on objective factors or fundamental

implausibilities, rather than subjective considerations. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th

Cir. 2000).

In his decision, the ALJ stated, "The undersigned finds the claimant's allegations

regarding his limitations are not totally credible for the reasons set forth in the body of

the decision." (R. 18.) The ALJ further stated:

> While the claimant undoubtedly may experience some
> limitations and restrictions from his impairments, the
> reported severity of these impairments is not fully credible
> or supported by the objective medical evidence of record.

23

(R. 16.)

The ALJ also found that

> …[H]e has been prescribed and taken appropriate
> medications … for the alleged impairments, which weighs
> in the claimant's favor, but the medical records reveal that
> the medications have been relatively effective in
> controlling the claimant's symptoms with no side-effects.
> In addition, there is no evidence of the claimant being
> under any psychiatric or mental care.

(R. 16.)

Bieker claims that these statements regarding Bieker's medication and his alleged failure to treat have no foundation in the record, and are not true. The date of the hearing before the ALJ was November 9, 2005. (R. 13.) Bieker was seen by Dr. Munson on August 29, 2005, and then again on October 27, 2005 – less than two weeks before the hearing. (R. 106, 162.) With regard to the efficacy of Bieker's medications, Dr. Munson stated that Bieker "does not tolerate psychotropic medications well and it has always been a challenge to find medications he can tolerate without side effects." (R. 211.) This is consistent with multiple notations found in the medical evidence submitted. *See,* R. 109 ("He has tried Depocote (sic) and Lithium, but suffered with bad side effects." July 1, 2004); R. 151 ("Client states that he then saw Dr. Hill for approximately one year, during which many mood stabilizers and antidepressants were tried with no positive results." Sept. 1, 2004.); R. 159 ("He has not responded well to many medications in the past and could not tolerate them because of side effects." Aug. 26, 2004).

SSR 96-7 provides:

> In determining the credibility of the individual's statements,
> the adjudicator must consider the entire case record,
> including the objective medical evidence, the individual's
> own statements about symptoms, statements and other
> information provided by treating or examining physicians or

24

psychologists and other persons about the symptoms and how
they affect the individual, and any other relevant evidence in
the case record. An individual's statements about the
intensity and persistence of pain or other symptoms or about

the effect the symptoms have on his or her ability to work
**may not be disregarded solely because they are not
substantiated by objective medical evidence.**

It is not sufficient for the adjudicator to make a single,
conclusory statement that "the individual's allegations have
been considered" or that "the allegations are (or are not)
credible." It is also not enough for the adjudicator simply to
recite the factors that are described in the regulations for
evaluating symptoms. The determination or decision must
contain specific reasons for the finding or credibility,
supported by the evidence in the case record, and must be
sufficiently specific to make clear to the individual and to any
subsequent reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that weight.

SSR 96-7p (emphasis added).

SSR 96-7p also notes that the lack of consistency between an individual's statements

and other statements that he or she has made at other times does not necessarily mean that

the individual's statements are not credible. Symptoms may vary in their intensity, persistence,

and functional effects, or may worsen or improve with time, and this may explain why the

individual does not always allege the same intensity, persistence, or functional effects of his or

her symptoms. In other words, the individual may very well have "good days" and "bad days."

*See,* SSR 96-7p.

Moreover, the daily physical activities of a claimant are not relevant to a disability determination

based on mental impairments. *Jones v. Apfel*, 997 F.Supp. 1085, 1092 (N.D. Ind. 1997). The

introductory paragraphs of the mental impairments listings reflect this need to give special

consideration to the way claimants with chronic mental impairments structure their lives to

minimize stress and reduce symptoms and signs. *See,* 20 C.F.R. Part 404, Subpart P, Appendix 1,

12.00E. In such a case, the claimant may be much more impaired for work than the signs and

symptoms would indicate. *Id.*  A structured setting can certainly be found in the mentally

impaired claimant's home, which would reduce the mental demands placed on the claimant. *See,*

20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00F. Overt symptoms and signs of the underlying

mental disorder may be minimized, while the mentally impaired claimant's ability to function

outside of such a structured setting may not have changed. *Id.* In his credibility determination, the

ALJ focused on the fact that Bieker could perform some of his activities of daily living, *i.e.*, make

meals, do laundry, and some housecleaning. (R. 4.) The ALJ also relied on the findings that

Bieker was oriented to person, place, date, and time, and had reasonable thought processes. (R.

14.) However, in those same reports, it was noted that  Bieker's dress and grooming were

disheveled, he was wringing his hands, had poor eye contact, and was mumbling. (R. 14.)

Bieker and his friend also testified that  Bieker would often forget to eat, and had lost over 30

lbs. at one time as a result of his inability to remember to feed himself. (R. 247-248, 250, 256.)

In *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999), the court upheld an ALJ's

determination that the claimant's testimony was not credible where the ALJ specifically

enumerated three reasons for the finding. The ALJ found that the claimant's answers were vague

and evasive, that the claimant's descriptions of his pain were hesitant and indefinite, and that the

claimant had refused to volunteer information about his work history. *Id.*  In upholding the

ALJ's determination, the court stated that "[t]he ALJ's credibility determination of Butera, based

on these three factors, is precisely the sort of determination that the Court has recognized is

entitled to particular deference as it "involves[s] intangible and unarticulable elements which

impress the ALJ, that, unfortunately leave 'no trace that can be discerned in this or any other transcript.'" *Id.* In *Butera* the ALJ's reasons for finding the claimant not credible were not verifiable, but were clearly enumerated.

Bieker argues that, unlike *Butera*, the ALJ has not only failed to specifically and clearly enumerate permissible reasons for his rejection of Bieker's credibility, but those comments that are made are inherently inconsistent. *See*, SSR 96-7p. Rather, the ALJ particularly selected discrete statements in the medical evidence, and used those statements to support his determination that Bieker was not to be believed. Instead of considering the fact that Bieker was able to barely manage his activities of daily living in the highly structured and supportive setting of his home, the ALJ used Bieker's meager abilities to cope at home to his detriment. To the contrary, Bieker's reporting of his symptoms has been consistent and truthful. Furthermore, his statements of limitations are not only supported by Dr. Munson, his treating psychiatrist, but also by Dr. Lelek, Dr. Spores, and Dr. Allen.

The ALJ may not select and discuss only that evidence that favors his ultimate conclusion. *Diaz*, 55 F.3d at 307-08. And, the ALJ has a duty to "articulate some *legitimate* reason for his decision." *Clifford,* 227 F.3d at 872 (emphasis added). Furthermore, the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Id.* The ALJ failed to give reasons regarding his credibility determination that were significantly specific to satisfy the requirements of 96-7p. The ALJ failed to build a logical bridge between the evidence and his conclusion in determining that Bieker's testimony was not credible. The ALJ further failed to support his findings with any evidence actually found in the record. Therefore, the ALJ's credibility determination deserves no deference by this Court.

The vocational expert present at the hearing, Ms. Gianforte, testified that if the ALJ credited Bieker's testimony and gave proper weight to Dr. Munson's findings of limitations,  Bieker would be precluded from all work. (R. 259-260.)

Accordingly, for all the above reasons, this court finds that the ALJ's opinion was not based on substantial evidence in the record and that Bieker is entitled to disability benefits.

Conclusion

Based on the foregoing, the decision of the ALJ is hereby REVERSED.  This case is hereby REMANDED for an award of benefits.


Entered: November 20, 2007.


s/ William C.  Lee
William C. Lee, Judge
United States District Court